## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **GENI B.,**[1] | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **No. 3:20-CV-891-MAB**[2] |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
|     **Defendant.** | ) |

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), Plaintiff Geni B. ("Plaintiff") is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income (SSI) and Disabled Child's Insurance Benefits.[3] For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).

[3] For Disabled Child's Insurance Benefits, the claimant must be over the age of 18, and the disability must have predated her 22nd birthday. 20 C.F.R. § 404.350(a). Here, because Plaintiff's amended alleged onset date was after her 22nd birthday, the claim for Disabled Child's Insurance Benefits was dismissed (Tr. 1395). Plaintiff does not challenge the dismissal of this claim (*see* Doc. 15). Rather, she focuses on the denial of her application for SSI (*see id.*).

## PROCEDURAL HISTORY

Plaintiff applied for benefits in July 2013, initially alleging she became disabled as of October 11, 1980, her date of birth. She later amended the alleged onset date to July 22, 2013, the date of the application. The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act, and Plaintiff sought judicial review of the ALJ's decision. *See Boester v. Commissioner of Social Security*, SDIL Case No. 18-cv-88-JPG-CJP. The district court found that the ALJ overstated Plaintiff's ability to do things and the significance of her daily activities and thus reversed the ALJ's decision and remanded the matter for rehearing and reconsideration of Plaintiff's credibility and the RFC determination. *Id.* at Doc. 23.

The remanded claim was consolidated with a subsequent new claim for disability benefits filed on November 30, 2017 (*see* Tr. 1385). ALJ Katherine Jecklin held a hearing on June 10, 2019 and issued a new decision that was once again unfavorable to Plaintiff (Tr. 1392–1413).  Plaintiff submitted written exceptions to the ALJ's unfavorable decision, (Tr. 1654–55), which the Appeals Council denied (Tr. 1385–91). The ALJ's decision thus became the final agency decision. Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this Court seeking judicial review for a second time of the ALJ's adverse decision.

## APPLICABLE LEGAL STANDARDS

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[4] Under the Social Security Act, a person is disabled if they are "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 1382 and 1382c(a)(3)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step sequential analysis and considers whether: "(1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity ("RFC") leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (citation omitted).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were

---

[4] The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416.

3

made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e will reverse only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (citation and internal quotation marks omitted). The Court's review "is limited also to the ALJ's rationales;" the Court will "not uphold an ALJ's decision by giving it different ground to stand upon." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943)).

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

Plaintiff was born in October 1980 (Tr. 310) and was 32 years old when she applied for disability benefits in July 2013. She was removed from her mother's care when she was five or six and adopted (Tr. 1171, 2764).

A report from a psychological consultation in 2001 indicates "[a]t age two, [Plaintiff] was diagnosed with some sort of intellectual retardation with delayed development" (Tr. 450). IQ testing in 1994, when Plaintiff was 14 years old, revealed a full-scale IQ of 70, and indicated that Plaintiff had "borderline intellectual ability" (Tr. 420–426).[5] IQ testing done in 2001, when Plaintiff was 21 years old, revealed a full-scale IQ of 75, with a verbal scale IQ of 78 and a performance scale IQ of 75, and again indicated that Plaintiff had "borderline intellectual functioning" (Tr. 450–52). Plaintiff underwent another neuropsychological evaluation in 2016, however, it does not appear that any of the tests that were administered provided a full-scale IQ score (*see* Tr. 1170–1177; *see also* Tr. 1392–1413; Doc. 15; Doc. 20).

Plaintiff received special education services throughout her academic career, including speech and language services, "remedial services," and a classroom aide (Tr. 420–26, 1171, 2660, 2764). She repeated kindergarten and second grade (Tr. 422). She was also diagnosed with attention deficit disorder ("ADD") at some point in her childhood and she took Ritalin to manage it (Tr. 422, 450, 2660, 2764). Plaintiff graduated high school in a special education program (Tr. 450). Her final report card from high school indicates she was ranked 122/138 in her class and her GPA was 0.00 (Tr. 309)

---

[5] There seems to be a discrepancy in the results of the 1994 testing. Plaintiff says the ALJ acknowledged the full scale IQ score of 69 in her decision (*See* Doc. 15, p. 7). However, a careful review of the 1994 Report reveals a full-scale IQ of 70 (Tr. 423).  Testing from December 18, 1991 and January 6, 1992 revealed a full scale IQ of 69 on the Wechsler Intelligence Test and a 68 on the Stanford Binet test (Tr. 422, 423). It is unclear to the Court which test was conducted on which date. But the 1994 Report is clear that the "current assessment results" reveal a full-scale IQ of 70, not 69 (Tr. 423).

Plaintiff filled out several function reports and her brother-in-law filled out a third-party function report (Tr. 329–37; 346–53; 362–69; 1703–10). Plaintiff also testified at the evidentiary hearing in front of the ALJ (Tr. 1426–54).

Plaintiff has never lived independently (Tr. 1171, 1449, 2764). She lived with her adoptive mother until she died and now lives with her adoptive sister and her family (Tr. 1449, 2764). She testified at the hearing that the main reason she cannot work is "I forget half of what I'm supposed to do" (Tr. 1435). She indicated that she has problems remembering instructions, gets easily confused if given multiple tasks, and cannot comprehend complex conversations or problems (Tr. 329, 362). Her brother-in-law said she even has trouble understanding simple tasks (Tr. 346).

Plaintiff and her brother-in-law both indicated that she cannot pay attention for very long (Tr. 334, 351, 1708, 1737); she estimated for 5-10 minutes (Tr. 367). They both indicated that Plaintiff does not follow written or spoken instructions well (Tr. 334, 351, 367, 1708, 1737), and she does not finish what she starts (Tr. 334, 351, 367). She said she "cant follow [through] because I forget what I supposed to do . . . get distracted" (Tr. 1732). They both agreed that she does not handle stress or changes in routine well (Tr. 334, 352, 368, 1709, 1738).

Plaintiff and her brother-in-law also agreed that she needs to be reminded to do everyday tasks, such as bathe, take her medicine, and clean her room (Tr. 331, 348, 364, 1703, 1704, 1705, 1733, 1734). Cleaning her bedroom is the only chore Plaintiff does around the house, and it takes her several hours (Tr. 331, 348, 364, 1705, 1733). On one of the function reports, Plaintiff said it takes her so long to clean her room because she

"keep[s] misplacing things and destroy[s] room looking" (Tr. 1733). Plaintiff does not care for any people or animals (Tr. 330, 347, 363). At some point, she also did laundry (*see* Tr. 364, 1734), but no longer does because she broke the washing machine (Tr. 1443).

Plaintiff only prepares simple meals, like sandwiches, cereal, and things that are microwavable (Tr. 331, 348, 364, 1705, 1734). Doing so takes her "a long time," "longer than it should" (Tr. 331, 348, 364, 1705, 1734). She puts food in the microwave and then forgets about it, according to one of her function reports (Tr. 1734). And Plaintiff is not allowed to use the stove unless her sister or brother-in-law is home with her because she forgets to turn it off (Tr. 331, 348, 1444, 1734)

Plaintiff goes to the library about once a week (Tr. 333, 350, 1736). She also goes grocery shopping with her sister or brother-in-law every week or every other week (Tr. 332, 349, 365, 1442, 1705, 1735). Grocery shopping takes a long time because she forgets a lot of things (Tr. 1436, 1705, 1706).

Plaintiff's hobbies include watching television, reading books, and doing puzzles (Tr. 330, 333, 347, 350, 363, 366, 1444, 1707, 1733, 1736). She indicated she only does puzzles "a couple times a month" and she "need[s] help to complete" (Tr. 366; *see also* Tr. 1707). She said she "loves to read" but has trouble understanding what she reads (Tr. 1444, 1446). She wrote on her function reports, "My family says I read same books and get different results" and "[b]ooks and TV shows have different endings each time" (Tr. 333, 366). She testified that Twilight is her favorite book and she understands it because she has watched the movie "like 100 times or more" (Tr. 1446).

Dr. Harry Deppe conducted a psychological consultative examination of Plaintiff on three separate occasions: 2013 (Tr. 512–15), 2018 (Tr. 2599–2602), and 2019 (Tr. 2759–2762). Each examination lasted about 45 minutes (Tr. 514, 2602, 2762). At the first examination in 2013, Dr. Deppe remarked that Plaintiff "appear[ed] to be functioning an at approximate low average level of intellectual ability . . . [and did] not appear to be mentally retarded" (Tr. 512–15). Her mood was somewhat defensive at times. She fidgeted in her chair and eye contact was poor.  There were times when her expressions and mannerisms seemed noticeably exaggerated for the topic being discussed. She made a "fair to poor effort" answering questions. For example, she said she had no idea how old she was, when she last worked, or what kind of job she did. But Dr. Deppe noted that Plaintiff had no difficulty staying on task and her answers and comments, while brief, were coherent and relevant. She was oriented to time, place, and person, and correctly gave the date, time, her address, and phone number. Her fund of general knowledge was "good" and she was able to, for example, name five large cities in the United States, identify Oprah Winfrey, and describe a recent news event (*Id.*). Her memory for recent and/or remote events was "good," and she was able to name five presidents, give her mother's maiden name, and give her own date of birth and social security number (*Id.*). Her immediate memory was "fair"; she could recall six digits forward and three in reverse (*Id.* at 513–14). When asked about her daily activities, Plaintiff reported that she helped with "some housework," like cooking and laundry, she liked to read and watch TV, and she could bathe and dress herself. She said her relationships were "good with [her] family." Based on that information, Dr. Deppe's diagnosis for Plaintiff was

"borderline intellectual functioning," and he concluded that Plaintiff's "ability to complete tasks in a timely and efficient fashion appears adequate."

Dr. Deppe's second examination was not until February 2018 (Tr. 2599–2602). Prior to that, Plaintiff's primary care physician, Dr. Jane Tucker, submitted a treating source statement dated November 26, 2017 (Tr. 2764–65). At that time, Plaintiff had been a patient of Dr. Tucker's practice for approximately three years (Doc. 2764), and medical records show that Dr. Tucker saw Plaintiff approximately 20 times during that time (*see* Tr. 855–1227, 2193–2499, 2500–67).[6] Dr. Tucker stated, in pertinent part, that Plaintiff "presents as anxious and very immature for her age" and "[s]he has never been able to sustain employment due to difficulties learning new tasks, staying on task, and . . . task completion" (Tr. 2764). Dr. Tucker further stated that Plaintiff "helps minimally around the house with some basic chores but finds many tasks or instructions stressful and anxiety provoking" (*Id.*). Dr. Tucker opined that Plaintiff "will not be able to sustain meaningful employment due to her learning disabilities and child-like demeanor" (*Id.*). As of January 2019, which was Dr. Tucker's most recent medical record in evidence, Plaintiff continued to carry diagnoses of "adult learning disorder," attention deficit disorder, and "mild mental retardation." (Tr. 2747–48).

Dr. Deppe's second examination in February 2018 was similar in format to the first one (*see* Tr. 512–15, 2599–2602). Dr. Deppe noted Plaintiff's mood was "somewhat agitated" at times (Tr. 2599–2601). Her eye contact was fair to poor. Again, there were

---

[6] Dr. Tucker continued seeing Plaintiff thereafter; records show she saw Plaintiff approximately eight times in 2018 (*see* Tr. 2648–2752), and in January 2019 (*see* Tr. 2746).

times when her expressions and mannerisms seemed noticeably exaggerated for the topic being discussed. She made a "fair effort" in answering questions. And Dr. Deppe noted that Plaintiff had no difficulty staying on task and her answers and comments were coherent and relevant. When asked about her daily activities, Plaintiff reported that she spent her time watching television, reading, using a computer, cleaning her room, and doing "a little cooking." (Tr. 2601). She reported that her relationships with others were "not that good." (Tr. 2601). She also reported that she last worked in 2011 as a housekeeper but got fired due to "problems with a coworker." (Tr. 2601). Dr. Deppe concluded that Plaintiff's "ability to complete tasks in a timely and efficient fashion appears fair to good" and she had a "fair" ability to relate to others; understand and follow simple directions; maintain attention required to perform simple, repetitive tasks; and withstand the stress and pressures associated with a day-to-day work activity (Tr. 2602). Dr. Deppe abandoned his previous diagnosis of "borderline intellectual disorder" and gave Plaintiff a diagnosis of "personality disorder" instead (Tr. 2602).

On March 5, 2018, during the agency's initial review of Plaintiff's disability application, non-examining agency psychiatrist, Dr. Howard Tin, reviewed Plaintiff's medical records and completed two questionnaires—a Psychiatric Review Technique ("PRT") Form and a Mental Residual Functional Capacity Assessment ("MRFC")(Tr. 1516–29). On the PRT, Dr. Tin stated that Plaintiff had "mild" limitations in her ability to understand, remember, or apply information and her ability to adapt and manage herself (Tr. 1522). Dr. Tin stated that Plaintiff had a "moderate" limitation in her ability to interact with others and her ability to concentrate, persist, or maintain pace (Tr. 1522). On the

MRFC, Dr. Tin marked that Plaintiff was moderately limited in her ability to appropriately interact with the general public and explained she should be limited to work tasks that do not require such interaction (Tr. 1525, 1526). He also marked that Plaintiff had moderate difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods (Tr. 1525). But in a supplemental narrative explanation, Dr. Tin opined without elaboration that Plaintiff was nevertheless capable of performing simple one and two-step tasks (Tr. 1526). Dr. Tin stated that Plaintiff's activities of daily living and mental status exam "were not severely impaired" and her allegations regarding the severity of her disorder (e.g., a short attention span, inability to complete tasks, inability to follow spoken and written instructions, and inability to handle stress and changes in routine) were "not consistent with [her] ability to function generally well from day to day" (Tr. 1526). On June 14, 2018, at the reconsideration stage, another non-examining agency physician, Dr. Keith Burton, concurred with Dr. Tin's conclusions (Tr. 1544).

Dr. Deppe's third examination in April 2019 was similar in format to the first two (*see* Tr. 512–15, 2599–2602, 2759–62). Dr. Deppe noted Plaintiff's mood was "somewhat agitated" at times, she made a "fair to good effort" in answering questions, and she had no difficulty staying on task and her responses were coherent and relevant (Tr. 2759–62). Of particular note, Plaintiff told Dr. Deppe that she had never been treated on an inpatient basis by a psychiatrist or psychologist (Tr. 2760), even though she had been hospitalized

more than once for a suicide attempt,[7] which Dr. Deppe had even noted in his second report (Tr. 2599–2601). She reported seeing a counselor for depression and stated she was "depressed about everything" (Tr. 2760). When asked about her daily activities, Plaintiff told him that all she did was go shopping with her sister and go to doctor's appointments. She reported her relationship was "good with [her] family." She also reported that she last worked in 2006 (as opposed to 2011, which was her answer at the previous exam) as a housekeeper but was "let go." Dr. Deppe concluded that Plaintiff's "ability to complete tasks in a timely and efficient fashion appears fair to good." Her ability to relate to others, understand and follow simple directions, and maintain attention required to perform simple, repetitive tasks was "intact." And her ability to withstand the stress and pressures associated with a day-to-day work activity was "fair." Dr. Deppe reinstated his original diagnosis of borderline intellectual functioning and abandoned his diagnosis from the second exam of personality disorder.

At the hearing on June 10, 2019, a vocational expert testified (Tr. 1428, 1450). The ALJ posed a hypothetical to the vocational expert, limiting the hypothetical person to "simple, repetitive, routine tasks involving only simple work-related decisions and few, if any workplace changes." (Tr. 1450). In response to the ALJ's hypothetical, the vocational expert testified that certain jobs did exist in the local and national economy that the hypothetical person could perform, and the examples the vocational expert provided were ultimately adopted by the ALJ in her decision (*Compare* Tr. 1450-51 *with*

---

[7] She went to the emergency department at St. Mary's hospital in March 2017 with suicidal thoughts and was kept overnight (Tr. 2604–30; *see also* Tr. 2234). She was admitted to St. Anthony's hospital for approximately a week and a half in May 2017 following a suicide attempt (Tr. 1763–1903, *see also* Tr. 2312).

Tr. 1412). The ALJ also asked of the "tolerance for time off task in unskilled work" and the vocational expert testified that being off task 10% or more would result in termination after a period of time (Tr. 1452).[8] When asked about tolerance for absences, the vocational expert indicated that two absences in one month or one absence a month occurring over two consecutive months would result in termination (Tr. 1452.). And finally, when asked about task redirection in unskilled work, the vocational expert testified that in the initial training, an unskilled worker might be provided additional redirection for work-related activities (Tr. 1452). However, after the initial training phase (anywhere from two weeks to thirty days), an unskilled worker will be expected to know their work and not require redirection toward their work-related activities (Tr. 1452).

### THE ALJ'S DECISION

ALJ Jecklin followed the required five-step analytical framework and concluded that Plaintiff was not disabled (Tr. 1392–1413). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date (Tr. 1398). At step two, the ALJ found that Plaintiff had several severe impairments, including borderline intellectual functioning, major depressive disorder, schizoaffective disorder, attention deficit disorder, post-traumatic stress disorder, personality disorder, asthma/reactive airways dysfunction syndrome, and hip dysplasia (as well as, a number of non-severe impairments) (Tr. 1398–99). At step three, the ALJ determined that none of Plaintiff's conditions, alone or in combination, met or medically equaled a listed

---

[8] Time "off task" also includes the need for extra breaks by the employee (Tr. 1452).

impairment (Tr. 1399–1401). The ALJ then found that Plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. 404.1567(b) with the following limitations:

> the claimant can never climb ladders, ropes, or scaffolds, and can only occasionally climb ramps and stairs. The claimant can occasionally balance, stoop, kneel, crouch, or crawl. The claimant can have no more than occasional exposure to extreme cold, extreme hear, hazards, such as unprotected heights and unprotected moving mechanical parts, and pulmonary irritants, such as dust, fumes, odors, gases, and poor ventilation. The claimant can perform work limited to simple, routine, repetitive tasks involving only simple, work-related decisions, and few, if any workplace changes. The claimant can perform no work with an assembly line or conveyor belt. The claimant can have no contact with the public and occasional contact with coworkers.

(Tr. 1402–11). And at Steps 4 and 5, the ALJ found that Plaintiff had no past relevant work but based on the testimony of a vocational expert, the ALJ found Plaintiff was able to adjust to other work in significant numbers as a hand packer, production worker, or cleaner (Tr. 1411, 1412).

### <u>Issues Raised by Plaintiff</u>

1.  Whether the ALJ erred in failing to specifically address listing 12.05 for intellectual disorder, and

2.  Whether the ALJ erred in failing to account for deficits in maintaining attention and concentration for extended period within the RFC finding.

(Doc. 15, p. 4).

**ANALYSIS**

### A.  The ALJ's Failure to Analyze Listing 12.05

Plaintiff first argues that the ALJ erred at Step 3 by finding that one of her severe impairments was borderline intellectual functioning but failing to consider whether Plaintiff met listing 12.05 for intellectual disorder (Doc. 15, pp. 5–9).

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing *by name* and offer more than a perfunctory analysis of the listing." *Wilder v. Kijakazi*, 22 F.4th 644, 652 (7th Cir. 2022) (citing *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (emphasis in original). That being said, an ALJ's failure to identify a listing by name will not be reversible error if it is clear from the written decision that the ALJ recognized the applicable listing and sufficiently analyzed the criteria relevant to the listing. *See Adkins v. Astrue*, 226 Fed.Appx. 600, 605–06 (7th Cir. 2007); *Barnett*, 381 F.3d at 668. But even if the ALJ does not offer such an analysis, it is not reversible error if the claimant fails to show that they meet the criteria for that listing. *Sosinski v. Saul*, 811 Fed. Appx. 380, 381 (7th Cir. 2020). *See also Wilder*, 22 F.4th at 653 ("[A] claimant bears the burden of proof at step three."); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (a claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing.").

Here, the listing at issue is 12.05, for intellectual disorder, which also may be described as intellectual disability, intellectual developmental disorder, or by historically used terms such as "mental retardation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2,

15

§12.00(B)(4). The listing can be satisfied by meeting the criteria of either paragraph A or B. *Id.* at §12.00(A)(2). Generally speaking, both paragraphs require the individual to have (1) significantly subaverage general intellectual functioning, (2) significant deficits in current adaptive functioning, and (3) manifestation of the disorder before age 22, but the showing required to satisfy those elements is different for paragraphs A and B. *Id.* at §§12.00(A)(3), (H)(1).

The ALJ did not mention Listing 12.05, which seems unusual, particularly given that it was addressed by the agency physician (*see* Doc. 1539), and the record is rife with mentions of Plaintiff's intellectual deficit. However, the Court does not believe that this failure is grounds to reverse the ALJ's decision. To begin with, Plaintiff does not argue that she meets the criteria of 12.05A (*see* Doc. 15, pp. 5–9). And the evidence plainly demonstrates that she does not. Under 12.05A, the first requirement—"significantly subaverage general intellectual functioning"—means the individual is cognitively unable to function at a level required to participate in standardized intelligence testing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, §§12.00(H)(2)(a), 12.05(A)(1). And the second requirement—"significant deficits in adaptive functioning"—means the individual is dependent on other for personal needs such as toileting, eating, dressing, and bathing. *Id.* at §12.05(A)(2). The evidence here shows that Plaintiff participated in standardized intelligence testing on multiple occasions and she could use the toilet, eat, get dressed, and bathe on her own. She therefore cannot meet the criteria for an intellectual disorder under Listing 12.05A, and it is not reversible error that the ALJ did not mention or explicitly analyze this portion of the listing.

Plaintiff's argument seems to be geared toward paragraph B of Listing 12.05 (*see* Doc. 15, pp. 5–9). The Court believes that the ALJ sufficiently discussed the criteria relevant to 12.05B in her decision, which must be read as a whole. *Zellweger v. Saul*, 984 F.3d 1251, 1252 (7th Cir. 2021) (citing *Jeske v. Saul*, 955 F.3d 583 (7th Cir. 2020). Under 12.05B, the first requirement—"significantly subaverage general intellectual functioning"—means a full-scale IQ score on a standardized intelligence test of 70 or below, or a full-scale IQ score of 71–75 with a verbal or performance IQ score of 70 or below. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, §§12.00(H)(2)(a), 12.05(B). The ALJ indicated that Plaintiff's full-scale IQ at age 14 was 69 (Tr. 1406).[9] And her full-scale IQ at age 21 was 75 (Tr. 1406). The ALJ also mentioned the testing that Plaintiff underwent in March 2016 but noted that the specialist who administered the test was concerned about the reliability of the results (Tr. 1406). Plaintiff takes aim at this portion of the ALJ's discussion and gives a number of reasons why she thinks the ALJ's discussion was faulty or misleading, while insisting that her IQ scores were sufficiently low to meet the requirement of listing 12.05 (*see* Doc. 15, pp. 5–9). But her arguments appear to be immaterial. The ALJ never said Plaintiff did not meet the first criteria of 12.05B (*see* Tr. 1406). And, in fact, the Court thinks the only fair reading of the ALJ's discussion is that Plaintiff *did* meet the first criteria of 12.05B of significantly subaverage general intellectual functioning (as well as the third criteria of manifestation prior to age 22).

---

[9] This was actually Plaintiff's full-scale IQ score on a test she took in 1991 or 1992. *See Supra* n. 6. *See also* Tr. 422, 23 (providing Previous Psychological Test Results). Her full-scale IQ score on the test she took in 1994 was 70 (Tr. 423 (providing "Current Assessment Results")).

As for the second criteria of 12.05B—significant deficits in adaptive functioning—this "refers to how you learn and use conceptual, social, and practical skills in dealing with common life demands." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, §12.00(H)(3)(a). The ALJ must evaluate whether the claimant's mental disorder causes at least one "extreme" limitation or two "marked" limitations in the following areas of mental functioning: (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. *Id.* at §§12.00(H)(3)(a), 12.00(E); *see also* §12.00(F) (outlining five-point rating scale and defining, in part, "marked" and "extreme" limitations). Importantly, this analysis is not unique to Listing 12.05; it must be considered for *all* of the mental disorders listed under section *Id.* at §§ 12.00. 12.00(A)(2), (A)(2)(b), (A)(3), (E), (F), (H)(3).[10]

Here, the ALJ considered whether Plaintiff met the listing requirements for a number of mental disorders, including Listing 12.03 (Schizophrenia spectrum and other psychotic disorders), 12.04 (Depressive, bipolar and related disorders), 12.08 (personality and impulse-control disorders), 12.11 (neurodevelopmental disorders), and 12.15 (stressor-related disorders) (Tr. 1400–01). Her analysis focused on whether Plaintiff met the "paragraph B" criteria for these listings, meaning whether Plaintiff had one extreme or two marked limitations in the four areas of mental functioning, which is the same thing

---

[10] For all of the listings under section 12.00, *except* 12.05 for intellectual disorder, the question of whether the claimant's mental disorder results in one "extreme" limitation or two "marked" limitations in the four areas of mental functioning is known as the "paragraph B criteria." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, §12.00(A)(2)(b). In other words, the "paragraph B criteria" for every listing except 12.05 is asking the exact same thing as the second criteria for listing 12.05B—that is, whether the claimant has at least one extreme or two marked limitations in the four areas of mental functioning.

that is required for the second element of 12.05B (Tr. 1400–01). She determined that Plaintiff did not (*Id.*). The ALJ explained, in great detail, how she reached her conclusion that Plaintiff had only moderate limitations in each functional area (*Id.*). This discussion adequately demonstrates that she did not believe Plaintiff met listing 12.05B. Plaintiff did not challenge any aspect of the ALJ's analysis of the four areas of mental functioning (Doc. 15, pp. 5–9), and therefore the Court will not address it.

**B.  The ALJ's formulation of the RFC**

Plaintiff's second argument is that the ALJ did not adequately account for her moderate limitations in concentration, persistence, or pace in formulating her RFC and the resulting hypothetical posed to the vocational expert (Doc. 15, pp. 9–18).

As a general rule, both the RFC assessment and the hypothetical posed to the vocational expert "must incorporate all of the claimant's limitations supported by the medical record," including deficiencies in concentration, persistence, or pace. *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021) (quoting *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019)). Generally, an ALJ cannot account for limitations in concentration, persistence, and pace by restricting a claimant to "simple, routine tasks and limited interactions with others" or "unskilled work." *Lothridge*, 984 F.3d at 1233; *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020); *Crump*, 932 F.3d at 570 (citing *Winstead v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019)); *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015) (quoting *Yurt v. Colvin*, 758 F.3d 850, 858–59 (7th Cir. 2014)). "[S]omeone with problems concentrating might not be able to complete a task consistently over the course of a workday, no matter how simple it may be." *Lothridge*, 984 F.3d at 1233 (quoting *Martin*, 950 F.3d at 373–74). *Accord Crump*,

932 F.3d at 570 ("[O]bserving that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift."); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity.")

Similarly, in presenting hypothetical scenarios, the ALJ must ensure that the vocational expert is "orient[ed] . . . to the totality of a claimant's limitations." *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) (quoting *O'Connor-Spinner*, 627 F.3d at 619); *Crump*, 932 F.3d at 570. "Again and again," the Seventh Circuit has "said that when an ALJ finds there are documented limitations of concentration, persistence, and pace, the hypothetical question presented to the VE must account for these limitations." *Winsted v. Berryhill*, 923 F.3d 472, 476 (7th Cir. 2019). The best way to do that is to include the specific limitations in the hypothetical. *Crump*, 932 F.3d at 570; *Moreno*, 882 F.3d at 730; *O'Connor*, 627 F.3d at 620–21 ("[F]or most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do.")

None of that is to say a limitation to unskilled work or simple tasks can *never* adequately account for moderate limitations in concentration, persistence and pace. *Lothridge*, 984 F.3d at 1234; *Milliken v. Astrue*, 397 Fed. Appx. 218, 221 (7th Cir. 2010). And the Seventh Circuit has not insisted on a per se requirement that this specific

terminology—"concentration, persistence and pace"—be used in the hypothetical in all cases. *O'Connor-Spinner*, 627 F.3d at 619. *See also Lothridge*, 984 F.3d at 1233 ("The ALJ need not use any 'magic words' in formulating a person's residual functional capacity . . . .") (citation omitted); *DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019) ("An ALJ need not use 'specific terminology . . . .'") (citation omitted); *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). The question for the Court is whether the ALJ "account[ed] for the totality of a claimant's limitations" in formulating the RFC and posing hypothetical questions to the ALJ. *Martin*, 950 F.3d at 374 (citing *Moreno*, 882 F.3d at 730); *see also Lothridge*, 984 F.3d at 1233; *O'Connor-Spinner*, 627 F.3d at 619 ("Our cases generally have required the ALJ to orient the VE to the totality of a claimant's limitations."); *Steele*, 290 F.3d at 942 ("Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record.") (emphasis in original).

Importantly, the ALJ is allowed to "reasonably rely upon the opinion of a medical expert who translates . . . findings [of moderate difficulties in sustaining concentration, persistence, or pace] into an RFC determination." *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *accord Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021).

Here, at Step 3, the ALJ determined that Plaintiff's impairments caused moderate difficulties in "concentrating, persisting, or maintaining pace," (Tr. 1400-01), which was then reiterated in formulating Plaintiff's RFC (Tr. 1409). In reaching this determination, the ALJ noted Plaintiff's own contentions that she has trouble concentrating and focusing (Tr. 1400). But then noted Plaintiff is also able to prepare meals, watch tv, and read, all of

which require some ability to concentrate, persist, and/or maintain pace (Tr. 1400-01). The ALJ also noted a number of medical records indicate that Plaintiff was able to stay on task, able to focus, and/or was well-engaged during the appointments (Tr. 1401). Consequently, the ALJ determined the evidence supported no more than a moderate restriction on Plaintiff's ability to maintain concentration, persistence, and pace (Tr. 1401).

The ALJ went on to determine that Plaintiff had the functional capacity to perform "simple, routine, repetitive tasks involving only simple work-related decisions and few, if any workplace changes" (Tr. 1402). The ALJ stated generally that Plaintiff's severe mental impairments were "wholly accommodated in limit[ing] her to work involving only simple, routine, repetitive tasks with only simple work-related decisions and few workplace changes, in addition to other limitations" (Tr. 1405–06; *see also id.* at 1403). The ALJ did not provide any further explanation, however, as to how and why she concluded that Plaintiff was capable of sustaining concentration and working at a sustained pace for an entire workday (*See* Tr. 1403).

The commissioner argues that the ALJ's decision is fine because she relied on narrative medical opinions setting forth the conditions under which the claimant could adequately maintain concentration, persistence, and pace (Doc. 20, p. 17). But that is not the case. The ALJ also said the RFC was supported by "the most recent DDS opinions" (Tr. 1411). But the ALJ did not specifically mention Dr. Tin and Dr. Burton's conclusion that Plaintiff could still do simple tasks (*see* Tr. 140-12). Plus, Dr. Burton and Dr. Tin did not provide any explanation as to how they concluded that despite Plaintiff's limitations, she was still capable of performing simple one and two-step tasks (*see* Tr. 1526, 1544).

Additionally, the ALJ determined that the evidence supported greater limitations for Plaintiff than was found by Dr. Burton and Dr. Tin (Tr. 1410, 1411). She did not, however, explain why Plaintiff was nevertheless still capable of performing "simple, routine, repetitive tasks involving only simple, work-related decisions, and few, if any workplace changes," despite her more restrictive limitations. The ALJ also gave "significant weight" to Dr. Deppe's opinion that Plaintiff could maintain attention required to perform simple, repetitive tasks (Tr. 1410). Dr. Deppe did not, however, provide any narrative explanation as to how he arrived at this conclusion. The Court also notes that the ALJ ran through a laundry list of appointments where Plaintiff presented with "a normal mental status" and "was able to participate in the discussion [and] stay on task" (Tr. 1401, 1405- 1408). But the fact that Plaintiff could stay on task during medical appointments that never lasted even an hour has little to no apparent bearing on whether Plaintiff can maintain pace or stay on task for an entire workday. This reasoning fails to build the required "logical bridge" between evidence and conclusion. *See, e.g., Lothridge*, 984 F.3d at 1233. *See Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014) ("[T]he sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity.") (citation and internal quotation marks omitted).

Simply put, neither the ALJ nor any of the medical opinions she relied on provided an actual explanation as to how and why they concluded that Plaintiff was capable of sustaining concentration and working at a sustained pace for an entire workday. In other words, none of the physicians adequately translated Plaintiff's limitations into an RFC that the ALJ could reasonably adopt.

For the reasons explained above, the ALJ's RFC determination is not supported by substantial evidence. The ALJ failed to build a logical bridge between her determination that Plaintiff had a moderate limitation in concentration, persistence, or pace and the ultimate RFC finding. Although it is not this Court's role "to displace an ALJ's judgment by making our own findings about the facts," the Court "cannot uphold an administrative determination that failed to explain the outcome adequately." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021).

## Conclusion

The Commissioner's final decision denying application for Supplemental Security Income is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATE: March 29, 2022**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**